PARNACHER et al. v. MOUNT.

No. 34531. March 25, 1952.

Rehearing Denied Sept. 30, 1952.

Application for Leave to File Second Petition for Rehearing Denied Oct. 21, 1952.

*248 P. 2d 1021.*

Turner M. King and Carloss Wadlington, Ada, for plaintiffs in error.

McArthur & Orton and Claude V. Thompson, Ada, for defendant in error.

HALLEY, V. C. J. Liesiny Walton was a fullblood Chickasaw Indian. She

died February 12, 1949, at about 78 years of age, while residing upon her homestead allotment in Pontotoc county, Oklahoma, where she had lived for many years. She left a will whereby she bequeathed to her three living children, Nonles Parnacher, Devet Parnacher, Nannie Parnacher (now Johnson), and a granddaughter, Salina Scott, the sum of five dollars each. The remainder of her estate, including her homestead allotment, she gave to Houston B. Mount, a white man not related to her. She appeared before the county judge of Pontotoc county with the attorney who had prepared her will and with her attesting witnesses and offered to acknowledge her will before him, and requested his approval thereof. The will was dated August 28, 1945, and named Houston B. Mount as executor without bond. The county judge of Pontotoc county refused to approve the will upon the ground that he did not consider it such a will as warranted approval.

Earlier in 1945, testatrix had appeared before the United States Probate Attorney and asked him to prepare her will, giving her land to Houston B. Mount, but he told her that he did not draw wills for fullblood Indians giving their property to white people. She could not speak or understand the English language and spoke through an interpreter. In September, 1945, her attorney, who had prepared the will, together with the testatrix and her two attesting witnesses, went to Pauls Valley in Garvin county and sought approval of the will by the county judge of that county, advising him that the county judge of Pontotoc county had refused to approve it. The will was approved by the county judge of Garvin county.

After the death of the testatrix, her will was filed for probate in the county court of Pontotoc county by Houston B. Mount, the principal beneficiary and named executor. The above-named heirs of the testatrix contested the will. After hearing, the court denied probate,

and Houston B. Mount appealed to the district court of Pontotoc county, which admitted the will to probate and named Houston B. Mount as executor. It is from that order that the children and granddaughter of the testatrix have appealed to this court.

Contestants submit five propositions in support of their contention that the will is invalid and should not have been admitted to probate. We shall first consider the contention that the will is void as to restricted property under sec. 23 of the Act of April 26, 1906 (34 Stat. 137) as amended by sec. 8 of the Act of May 27, 1908 (35 Stat. 312), which provides:

"Every person of lawful age and sound mind may by last will and testament devise and bequeath all of his estate, real and personal, and all interest therein: Provided, that no will of a fullblood Indian devising real estate shall be valid, if such last will and testament disinherits the parent, wife, spouse, or children of such fullblood Indian, unless acknowledged before and approved by a judge of the United States court for the Indian Territory, or a United States Commissioner, or a judge of a county court of the State of Oklahoma."

It will be noted that the Act provides for acknowledgment before and approval by "a judge of a county court of the State of Oklahoma." It contains no specific provision as to venue. There is nothing to prohibit any county judge in Oklahoma from approving such a will. The act of approving or disapproving a will is a ministerial act, and the county judges are officers of the United States when performing such function. The purpose of the Act obviously was to protect fullblood Indians from being imposed upon by unscrupulous persons of more experience in matters involving property. We think the authority given to county judges by the above Act is not such as to render the action of the first one to whom a will is submitted final and binding upon all other county judges in the state. We believe that our view is supported by the same Act

of Congress, wherein it is provided that conveyances by fullblood Indian heirs must be approved by the judge of the county court having jurisdiction to administer the estate of the deceased from whom the fullblood heirs inherited the land. Surely such a provision would have been inserted in the above-quoted section of the Act if it had been intended to restrict approval of a fullblood's will to any single or particular county judge.

The will before us appears to have been properly executed, attested, and acknowledged before, and approved by, a county judge of Oklahoma. In Armstrong et al. v. Letty et al., 85 Okla. 205, 209 P. 168, it was said in the first syllabus:

"The approval and acknowledgment of the will of a fullblood Indian, required by Act Cong. April 26, 1906, Sec. 23, as amended by Act Cong. May 27, 1908, Sec. 8, is not an element of the execution and attestation contemplated by the statute of Oklahoma and is not within the purview of the jurisdiction of the county court in admitting a will to probate."

And in the body of that opinion it was said:

"This court has repeatedly held that the sole queston involved, when a will is offered to the county court for probate, is the factum of the will. That is, has the will be executed and attested in the manner and form required by the statutes, and was the testator competent to make a will at the time he made it, and was he free from the disabilities which operate under our statute to defeat the will?"

The above Acts further provide that any United States Judge or Commissioner in Oklahoma may approve such wills, and nowhere indicate that such action must be taken by any particular United States Judge or Commissioner.

Contestants complain that Luster Cook, probate attorney, was permitted to testify that Liesiny Walton came to him and asked him to write her will, making Houston B. Mount the beneficiary; that she said he had been "nice" to her; that an interpreter and perhaps others were with her and heard her statements relative to the terms of the will. This was some months before she finally made a will.

In Wright v. Quinn, 201 Okla. 565, 207 P. 2d 912, this court announced in the first syllabus:

"Title 12 O. S. 1941 §385 provides an attorney shall be incompetent to testify concerning any communications made to him by a client in that relation. The rule, however, does not apply to communications openly made in the presence of third persons. To enjoy the protection of the statute they must have been made in confidence of the relation and under such circumstances as to imply that they should ever remain secret."

The Oklahoma statute on privileged communications between attorney and client, being subd. 4, sec. 385, 12 O. S. 1951, was adopted from Kansas; and In re Wilkins' Estate (Hewitt v. Wilkins), 199 Okla. 249, 185 P. 2d 213, followed the Kansas rule that an attorney who prepares a will may testify as to the facts and circumstances in connection with its preparation and execution in order to establish that the will expresses the wishes of the testator and was his free and voluntary act. We find no error in admitting the testimony of the probate attorney, despite the fact that he declined to prepare the will. It is not disputed that the statements of Liesiny Walton to him were made in the presence of others and were not of such confidential nature as to bar their admission in evidence.

If there was error in refusing to compel Houston B. Mount and his attorney, C. L. McArthur, to give their depositions prior to trial, we think it was rendered harmless when both appeared at the hearing and testified. Again, sec. 276, 20 O.S. 1951, has been held not applicable to probate matters, though tried in the district court on appeal from the county court. Welch v. Barnett, 34 Okla. 166, 125 P. 472.

In contestants' application to have the district judge disqualified, we find no grounds set out as are contained in sec. 571, 22 O. S. 1951. Only bias and prejudice are alleged, based upon the friendship of the judge and Houston B. Mount, and upon the fact that the judge was a customer at Mount's clothing store. It was admitted later that one of the attorneys for contestants was a boyhood friend and schoolmate of the same judge. No facts were proved to establish bias or prejudice. In Gee et al. v. Security Bank & Trust Co. of Enid, 186 Okla. 477, 98 P. 2d 922, this court announced the rule in the second syllabus as follows:

"An application filed in a civil case to obtain a change of venue or disqualify the judge on the ground of prejudice or bias is addressed to the sound discretion of the judge, and the ruling thereon will not be reversed on appeal, unless there appears to have been a clear abuse of such discretion."

A careful search of the record convinces us that contestants had a fair and impartial trial, and we find no error in the judge's refusal to disqualify.

It is contended that the findings and judgment of the trial court are contrary to the evidence on the issues of testamentary capacity, undue influence, duress and fraud. We find no evidence whatever to support a claim of fraud, duress, or undue influence. There is no evidence to indicate that Houston B. Mount ever tried to influence the testatrix to make him the beneficiary in her will, or that he ever suggested to her that she make a will. No witness testified that Mount ever visited her, though she lived only five miles east of Ada on a paved highway. It is undisputed that he had lent her small sums of money for many years. There is not a word of testimony to indicate that he ever pressed her for repayment of these loans. She died owing him $197. There is undisputed testimony that he continued to lend her money up to the time of her death. One of the contestants testified that she knew that Houston B. Mount lent money to the testatrix shortly before she died.

Houston B. Mount had nothing to do with the preparation of the will. C. L. McArthur never represented Mount until after the death of Liesiny Walton. There is one circumstance only that might raise a presumption that Mount had some part in the preparation of the will: Testatrix was in the office of C. L. McArthur with two Indian friends, who were interpreters and who later signed her will as witnesses. Some months prior to that date, testatrix had asked Richard Colbert, a well-educated Indian friend, if he would prepare some papers for her. He advised her that he had no typewriter. She later told him that she wanted to make a will, and he said he could not prepare it for her, but that he knew a lawyer who could. While they were in the office of the lawyer, C. L. McArthur, they were informed that his fee would be $25 for preparing the will. Testatrix evidently had no money, and advised her attorney to call Houston B. Mount. He did call Mount, who advised him that "whatever Liesiny wants to do about it is all right with me—just whatever she wants to do", and that he, Mount, would advance the money to pay the fee. There is no showing as to whether or not Houston B. Mount charged the amount of the attorney's fee, or an additional $25 advanced by him for expenses of a trip to Pauls Valley to have the will approved by the county judge of Garvin county, to Liesiny Walton's account with him.

It was admitted that Houston B. Mount had lent Liesiny Walton small sums of money for years to meet her necessary expenses for food and medical attention. There is nothing in the record to show why or when Liesiny Walton decided that she wanted to make a will. She told one Tom Puller some three or four months before making her will that she wanted to leave her property to Houston B. Mount. The will itself, after devising to Houston B. Mount all the residue of her property

except the five dollars each to her children and granddaughter, contains the following statement:

". . . he having for many years assisted me financially in furnishing money for groceries, medical expenses, and other necessities, and having befriended me from time to time when I was in need of such assistance."

Richard Colbert testified in regard to the conversation had before the county judge of Pontotoc county, when he was requested to approve the will, as follows:

"Q. What did she say? A. She said that her children weren't helping her any financially and that she was unable to care for herself and that she was sick all the time and getting old and feeble and she was there by herself most of the time, and that was her reason for disinheriting the children.

"Q. What did she say about what Mount was doing for her, if anything, or was going to do, if anything? A. She said she was getting help from Mr. Mount; that every time she went to him for money for her needs he always loaned it to her or furnished it or supplied her needs.

"Q. Did she say making that will was her way of getting money for her needs. A. Yes.

"Q. Did she say she figured that she would be able to get money when she needed it from then on, for making the will, to get medicine and such as that? A. I don't think she mentioned any agreement about the future, I don't think she mentioned to me about that."

Judge Goodwin, county judge of Garvin county, who approved the will, testified as follows:

"Q. Do you remember whether or not she stated why she wanted to leave most of it to Houston Mount? A. Yes, sir. I asked her why and she said because her children hadn't taken care of her and he had furnished her medical aid and groceries when she didn't have anyone else to furnish them for her and he had taken care of her on those occasions when no one else would take care of her."

There was considerable argument about the fact that it was nowhere shown that the testatrix was ever advised that she might revoke her will. There is no evidence that during the three and one-half years from the date when the will was executed until her death, she ever expressed any desire to dispose of her property in any manner other than that provided in the will. It is well established that a will which excludes relatives by blood, who would inherit under the law, in favor of unrelated persons, is generally regarded as an "unnatural" will. In Re Estate of Hart (Turner v. Porter), 106 Okla. 180, 233 P. 227, this court quoted from the opinion written by Mr. Justice Kane in Re Cook's Estate, 71 Okla. 94, 175 P. 507, wherein it was said:

". . . The right to make a will includes the right to make it according to the testator's own desires, subject only to the statutory restrictions. Unequal or unnatural provisions in themselves raise no presumption of undue influence. They may be considererd with other evidence in determining the question, Is this the testator's will? but they do not shift the burden of proof, and, in the absence of proof that undue influence has been exercised, they have no weight. . . ."

In the Hart case, supra, the court further said:

"It is true that the testator had relatives by blood, among them being the contestant, who no doubt had claims upon his bounty, but courts have no power to control the right of an individual to do with his own as he pleases so long as he possesses testamentary capacity and no undue influence has been exerted upon him."

This court has many times approved what are classed as "unnatural" wills. In Re Sporn's Estate, 190 Okla. 149, 121 P. 2d 602, the testator, a white man, left a will devising approximately $50,-000 to a Negro woman who had been employed by him as a servant and the residue of his estate to trustees for a Negro boy, a nephew of the principal beneficiary. The testator was 80 years

of age at the time he executed the will, but it was approved by this court. The testimony as to testamentary capacity is voluminous. More than 40 witnesses testified. Many of those who testified for contestants admitted that they did not believe that any fullblood Indian woman of the age of testatrix, who could not speak, read, or write the English language, could understand a will. Many of these witnesses were clearly prejudiced in favor of contestants, being mostly of Indian blood.

We have carefully considered all of the testimony as to the testamentary capacity of the testatrix, and we are unable to conclude that the findings and judgment of the trial court are clearly against the weight of the evidence. Liesiny Walton was old and feeble during her last years. However, the record shows that the Indian Department approved a deed from her to one of her sons, conveying a part of her land in 1943. In 1948, she was permitted to lease her homestead for oil and gas. A Mr. McKendree rented her land for grazing purposes, and the Department permitted the lessee to pay the rentals directly to her. This indicates that the Indian Department had confidence in her ability to handle her own affairs. The testatrix knew her children and granddaughter by name, knew where her land was located, and was able to travel alone by bus at about the time of the making of the will. She told her reasons for excluding her children in favor of one who never had failed to help her, and she doubtless had in mind that the will would insure her against want to the last. Gratitude, a keen sense of obligation for favors already received, and the belief that she would not be left in want in her last days seem to have motivated her in making the will she made. Such conclusion is supported by her own words and actions. They are logical and honorable, and go far toward establishing her capacity to understand the nature and consequences of her act in making a will.

The testimony in regard to testamentary capacity is too long to repeat in detail; but we have read and considered the facts and circumstances surrounding the execution of the will, and have concluded that the judgment of the trial court is not clearly against the weight of the evidence.

The judgment is affirmed.

CORN, GIBSON, DAVISON, O'NEAL, and BINGAMAN, JJ., concur. WELCH and JOHNSON, JJ., dissent.

WELCH and JOHNSON, JJ. (dissenting). Since we agree with the syllabus as stating correct rules of law, we deem it necessary to briefly state our dissenting views. We do not think the law rules of the syllabus are correctly applied to the facts.

This is an unusual case in view of the manner of obtaining the requisite approval of the will, and of the disposition made of the property of this illiterate full-blood Indian. Under the circumstances, we are impelled to the conclusion that a new trial should be ordered, with full and liberal right in the contestants to explore all related facts by depositions and otherwise, and with a re-examination of all facts and circumstances pertinent to the issues involved.

We think there was sufficient error in failure to fully protect the right to take depositions before trial, to justify reversal.

We think there was sufficient error in admitting testimony of the United States Probate Attorney to justify reversal. This testimony concerned communication with the Probate Attorney. He thought the communication was privileged as being between attorney and client and objected to testifying on that ground. The protestants likewise objected. We think the overruling of these objections was erroneous, and that the presence of the interpreter and agent did not remove the communication from the privileged class.

Such a retrial should not be thought to be too burdensome to proponent of the will. If the will stands the test of the more complete investigation and retrial, proponent would only be delayed a while. If this will cannot withstand the most searching attack then proponent ought not to prevail.